Case number 18-1213. Quake Rivers P&L Petitioners v. Securities and Exchange Commission. Ms. Loveson for the petition. Sorry, I'm not responding. Ms. Loveson for the petition. Good morning, Your Honors. May it please the Court, I'm Jane Luxton for Twin Rivers Paper Company Consumer Action and other co-petitioners. I would like to reserve two minutes of my time for rebuttal. This rule is flawed by a number of arbitrary and capricious agency actions. I would like to address three principal failings that require vacatur of the rule. First, the Commission completely failed to meet its clear statutory obligation in response to the findings and recommendations of its Investor Advisory Committee. Second, the Commission's economic analysis is fundamentally flawed in ways this Court has previously found require invalidation of a rule. Third, the Commission's claim of reasonableness is contradicted by overwhelming evidence in the rulemaking record. With respect to the Investor Advisory Committee, in enacting the Dodd-Frank Act, Congress established the Investor Advisory Committee specifically citing its duty to provide advice to the Commission on initiatives to protect investor interest. The Commission's governing statute requires it, on receipt of a recommendation from the Investor Advisory Committee, to quote-unquote promptly issue a public statement assessing the recommendation and disclosing the response, if any. In December 2017, the Investor Advisory Committee recommended to the Commission three measures that it recommended should be taken before the final rule would be promulgated. Instead of promptly responding and assessing that recommendation, the Commission let six months pass and then, buried in footnote 190 of more than 500, dismissed, without any real discussion, the recommendations of the Committee. Like much of the defense of this rule, the first treatment of the recommendations was a list of wishful thinking that if the Commission should, a recommendation that investment funds could adopt a layered disclosure approach, but this was not required in the rule. The Commission's brief does not deny its breach of these statutory obligations, instead argues no case law requires the rule be vacated for the failure. But if the Commission is permitted to ignore this requirement, it may as well be written out of the statute. However, this Court does not need to decide this case based on this ground alone. This Court has invalidated a previous Commission rule for unwillingness to give adequate consideration to a serious alternative in Chamber of Commerce versus SEC. There, the alternative was proposed by two dissenting Commissioners. Here, the alternative was proposed by a statutorily constituted Advisory Committee, which put forward three recommendations, which the Commission ignored. The Commission's economic analysis is flawed. The Commission conceded one error in its cost-benefit analysis, underestimating a cost by $6 million, close to 5% of the total savings estimated for the rule. The Commission tries to minimize the impact of this mistake, but it is part of a clear pattern in Rule 30E3 where the Commission approaches costs and benefits differently and opportunistically, in the words of Business Roundtable, it's consistently more willing to speculate on unquantifiable costs or unquantifiable benefits, while failing to consider unquantifiable costs, and to refuse to quantify costs that it could quantify. For example, the Commission makes no attempt to quantify the costs to investors who will rely on printing reports at home. Even though the Commission had no difficulty in its proxy materials rule, estimating exactly that same type of cost. In the proxy materials rule, the Commission had to use a range of costs for that estimate, but it did not flinch from making an estimate. Applying those figures in this case would amount to between 12 and 59% of the claimed net savings of this rule, enough to swing it from net benefit loss to the other way around. Further, the Commission made no effort to estimate the cost to investors of the time they will have to spend on the toll-free call system, even though the Commission went to some length to encourage funds to come up with a list of suggestions or provided a list of suggestions that the funds could use to mitigate the burden that it realized would be a company, those toll-free calls. The Commission's response to our argument on this is, quote, not one commenter argued the Commission could or should have done more to quantify these particular costs or provide a data that would have enabled it to do so. But the burden is not on commenters to demand a proper cost-benefit analysis or provide the data for it. That burden is on the Commission, and this Court has so held in Chamber of Commerce versus SEC and Business Roundtable. A number of additional examples are laid out in our opening and reply briefs, but they exhibit the same type of failings that this Court has found unacceptable in Business Roundtable and Chamber of Commerce. The Commission relies heavily on a claim that its policy judgment deserves deference because it says it made reasonable choices, but the argument fails for a number of reasons based on the administrative record before the Court. Most heavily, the Commission depends on the argument that its overriding objective of saving money for the investment funds nonetheless adequately protects investors who will now have the burden under implied consent of taking action to preserve their ability to reserve paper shareholder reports. But the final rule admits its abandonment of two key protections for investors who prefer to receive reports in paper form, quote, may reduce the burden on investors who prefer to receive reports in paper form. And it says, quote, may reduce the likelihood, compared to the proposal, that investors who prefer to access reports in paper form will elect to receive reports in that form, and then in consequence, which in turn potentially reduces the likelihood that investors will review the information in reports and similarly may result in less well-informed investment decisions and potential adverse effects on the efficiency of capital allocation across funds. Evidence in the record contradicts the Commission's attempt to rationalize the eroded protections. The final rule's two-year transition period with as many as six notices that will be sent allows the funds to mix in other information in those notices, diluting the impact of the statement and in no way substituting for the requirement of an initial statement accompanied by a prepaid card to respond in the form that investors most comfortable with paper form. The final rule also states that the information in the report should be used in a way that the shareholder reports would be most likely to use. The adopting release repeatedly refers to the importance of making sure this information going to investors is not, quote, unquote, unduly obscured, close quote, implying some degree of obscurity will be the norm. The claim that requiring a toll-free number process provides adequate protection is belied again by the Commission's list of suggestions it hopes the funds will adopt to reduce obstacles in the process. The Commission's list of suggestions includes that funds could voluntarily adopt, which the Commission freely admits would be contrary to their profit-maximizing motives, cannot be counted as protections for investors. These are merely voluntary measures that funds could take on. They're not required by the rule, and this cannot be considered a basis for defending the justification for the rule. All of this would be bad enough if it were not the case that investors who want electronic reports already have a complete ability to get them. Therefore, the rule is unnecessary, and in every way it's failure to meet the standards of the Commission's list of suggestions. The standards of arbitrary and capricious review in Motor Vehicles v. State Farm is clear. In conclusion, this rule is shot through with agency action that is arbitrary and capricious or otherwise not in accordance with law. This Court has previously admonished the Commission on several occasions and invalidated final rules that failed to provide adequate analyses of the economic implications of the rule, did not fulfill its obligation to consider serious alternatives. Or otherwise reflected arbitrary and capricious action. Here, the Commission has once again failed to meet those standards, and instead has put forward explanations for its decision that are implausible or counter to the evidence before the agency. We ask the Court to vacate the rule. Tracey Hardin on behalf of the Securities and Exchange Commission. As the petitioners alluded to, Rule 30E3 gives funds the option to change their default method of delivery of shareholder reports from paper delivery to an electronic form. Under any default system, some investors who prefer the alternative may fail to take the steps necessary to elect it. But here, of the two defaults at issue, only paper delivery incurs additional printing and mailing costs that are shared by all investors. So in adopting this rule, the Commission made the eminently reasonable decision that given current rates of Internet usage, as well as future trends, it made sense to allow funds the option of a default method that decreased these shared costs. And the arguments that the petitioners are making against the rationality of this rule either distort the Commission's analysis or ignore its discussion of the specific issues they raise. So do you want to talk about the IAC recommendations? Sure, Your Honor. The Commission fully satisfied its obligations under Dodd-Frank with respect to this recommendation. I do want to note, though, that the statutory obligations to respond to these recommendations are not a required part of rulemaking. So even if the Commission had failed to satisfy its obligations, there's no reason that failure would lead to vacateur of this rule. So Congress passes a statute that has some requirements in it, and the agency can just ignore them and develop a rule? I mean, that is the implication of what you're saying. I don't think it's what you mean, but... You're right, Your Honor, that's not what I mean. What I mean is that because the statute does not require the Commission to take any action in terms of regulating it, in response to these recommendations, and in fact the Commission has no requirement to agree with any of these recommendations... So when Congress passes a statute and sets up this committee to advise the Commission on the subject it is addressing in a rulemaking, the Commission can just ignore it? Your Honor, that's not what I'm saying. What I'm saying is whatever the... It sounds like you tell me that the Commission had no obligation to respond to the studies and other things. The Commission has a statutory obligation to respond, and there may well be a remedy for it. What I'm saying is the remedy is not vacateur of this rule, because under the APA there's no statutory requirement for the Commission to fulfill these obligations in the course of a rulemaking. So help me out here. There's no advisory committee that says, here are our thoughts about what you ought to take into account when you do A, and here are the reasons that we have for making these recommendations. Your Honor, that gives rise in the rulemaking context certainly to an obligation under the APA to address those as alternatives, which the Commission did here. So as I understand it, the Commission did one, and the other two, according to your brief, it's put on the agenda for the future. That's right, Your Honor, and maybe it's helpful to just sort of run through the recommendations and talk about precisely what the Commission did here. There are really sort of two overarching recommendations here that had some subparts. The first, of course, as petitioners alluded to, was the suggestion that the Commission consider the development of a summary shareholder report. Along the lines of the summary prospectus rule that it has, and what the Committee specifically recommended with respect to that was that the Commission consider developing that document through future comment, through investor testing, and perhaps by encouraging funds to experiment with that summary report. The Commission, in fact, did all three of those things as it lays out in the adopting release. It issued a request for comment the same day the rule was adopted. As to the development of a summary document, as laid out in the release, the officer of investor advocate is engaging in investor testing, and by allowing funds to include information from the report in the notices under the rule, the Commission is, in fact, encouraging funds to do the kind of experimentation that the Committee recommended. So the Commission not only... Thank you for your report, we're going to look into these things, but we're going ahead with our rule. Well, a couple of things, Your Honor. First, I think that's not quite what the Committee said. The Committee said it recommended this summary process, and then it also said that the Commission should continue to consider how to transition to electronic delivery, taking into account investor preferences and readership. And the Commission took into account both of those factors in adopting this rule. But also, just to circle back to your question, again, the statute specifically says that the Commission's not required to agree with the Committee here, nor is it required to actually take any action with respect to their recommendations. So merely because the Commission didn't fully adopt the Committee's recommendation does not mean it failed to comply with its statutory applications. I guess it's the Chamber of Commerce question, that's all I'm getting at. That's correct, Your Honor. The real rulemaking question arising from this is whether the Commission fully satisfactorily addressed these as alternatives. And as I said, the Commission did, in fact, discuss every issue that was raised by that advisor. But you would agree with me, would you not, that it certainly addressed one. And as to two, it said, we're looking into it. And just to be clear, which ones are you labeling one and two, so I can make sure I'm answering correctly? Well, the first one was about the original notice and the stamped address card, all right? And the Commission explained why, in response to the first recommendation, it was doing something slightly different, and it referred to all the comment it had received. Correct? Correct, Your Honor. And then your brief tells me that as to the second two recommendations, these are things that are scheduled for the future. Well, as to the development of a summary report, certainly that is scheduled for the future, and that was, in fact, the Committee's recommendation. I want to be clear, though, that the Committee didn't make a recommendation with respect to the reply card or the initial statement here. That those proposals in the notice of proposed rulemaking were supposed to address. It did talk about addressing the election of investor preferences, you're correct, as well as potential effects on readership. But again, what this Court requires under Chamber is that the Commission give a reasoned explanation in its consideration of alternatives. And the Commission did that. I just want to be clear about that. Certainly, Your Honor, because this Court's case law makes clear that agencies are, in fact, entitled to take an incremental approach to their regulatory program. And that's precisely what the Commission is doing here. So the world changes upside down, and then the Commission may get some more information that decides it may want to go back to the old way? Your Honor, to be clear, we think, even aside from the consideration of the summary report in the future, that the Commission's judgment here to adopt Rule 30E3 in the interim is fully justified by both in terms of reasonableness of the decision and in terms of the explanation given. It's just an advisory committee report, period. The advisory committee report certainly serves as an alternative that the Commission has to address in the rulemaking. But again, the statutory obligation is just to assess the issues raised by the Committee, and that is exactly what the Commission did. So let me just ask you, so you read Chamber of Commerce to mean that where an alternative is proposed, an adequate response is, that's an interesting idea. We're going to think about that, and we may, in fact, deal with it substantively in the future. In other words, you read Chamber of Commerce simply to mean you can't ignore an alternative, but it doesn't mean you have to buy into any of the substantive aspect of it. I think Chamber of Commerce stands for the proposition that the Commission has to give a reasoned explanation in its consideration of the alternative. But again, the Commission did that here. And if you look, actually, in the alternatives considered in the adopting release, the Commission specifically discussed the idea of making this kind of summary discussion mandatory. And the Commission made the judgment that it wanted to preserve flexibility for funds at this point. In determining what information may be appropriate for their particular investment base. And certainly that's a reasoned explanation, and it's in fact consistent with the alternative, if that's how we're referring to what the Advisory Committee recommended. Because they, in fact, recommended that the Commission further explore precisely what information should be required and in what format. So the Commission explained why it chose not to make that mandatory. In fact, its explanation is consistent with what the Advisory Committee itself recommended here. You know where I'm referring in your brief to these two proposals that are ready for the future? Are you speaking of the summary requirement, the summary document requirement? There were two of the recommendations of the Advisory Committee. I won't pursue this, but I just want to be clear. Your view is there's absolutely no problem with the economic analysis. There was an error, but it's a minor error, and basically harmless error. That's right, Your Honor. Your Honor, what this Court's case law says in that circumstance is that the question really falls back to the state firm question of whether the error in the analysis undermines the overall rationality of the rule, and certainly we don't believe that's the case here. What about your response to the arguments as to why some things were not quantified, as opposed to simply saying a qualified? Every time something came up, the rulemaking says, the Commission says, well, we don't have this data. We don't have this data. We don't have this data. Well, Your Honor, the Commission did quantify a number of the effects here. No, no, no. We're focusing on the issues before us right now. Of course, Your Honor, and the two the petitioners raise are the cost of home printing and the costs arising from the 1-800 call systems. With respect to the home printing, I want to be clear that, in fact, the Commission did precisely what this Court instructed in chamber, which is that it did give an estimate for the cost of printing a single report. What it couldn't do is aggregate those numbers into an overall estimate, and the Commission reasonably explained that it couldn't do that because there was no way to predict how many investors would print at home versus making the phone call to request the paper copy they're entitled to. The petitioners make this argument that the Commission should have picked up the analysis from a 2007 release in the proxy context, but if you go look at the derivation of sort of the 10% aggregate estimate in that proxy release, it's clear from, I think it's footnote 134 in that release, that that estimate was derived from data in the comment file that was specific to the proxy context. We don't have that kind of analogous data here, and there's no reason to think that the very same numbers should be plucked out of a different context and put into that here. But the Commission itself had no obligation to come up with this economic analysis then, unless comments gave them the data? Your Honor, this Court's case law has made clear that the Commission, while empirical data is obviously ideal, there are situations in which it can't be quantified. And the Commission is entitled to rely on a qualitative analysis in that context. But let me just be clear from your understanding of the record here. Was it the Commission's position that it didn't have the authority to get the information? Or that it would be useless to get the information? The Commission never said the information would be useless. I think what this Court's case law has recognized, and certainly is the case here, that when the Commission doesn't itself have the data, it can request data from commenters. It did that here, and no commenters suggested that the Commission could or even should quantify the particular issues that the petitioners are raising here. And in the absence of data from commenters, this Court has recognized that it's not a violation of the APA to fail to independently deprive commenters of data. So the Commission's fail-safe in this rule is staff will monitor the 1-800 operation and advise the Commission as to whether it's working effectively or not? I wouldn't say that's the fail-safe, Your Honor. I don't think that you need to get to the staff review to justify the Commission's determinations here. Well, the Commission throughout the rulemaking says, we don't know, we don't know. And it says, we hope everybody's going to make this simple. And we hope that everybody's going to be able to get access to their reports. And we'll have staff check and let us know. So that clearly is what the Commission is telling us. Not that the rule is arbitrary or capricious or anything, but that is the Commission's expectation. Two things, Your Honor. First, the Commission took a number of steps in the rule itself to both increase investor access to this information, to increase investor awareness of the change and their option to request paper, and to facilitate investors' election of the paper reports. I'm focusing specifically on the joint appendix, page 185, which is where the Commission goes on about everything I've just said. And to me, that says to the Commission, we have this great idea, we think it's going to work, but there are a lot of questions. Your Honor, what the Commission specifically said with respect to the 1-800 call systems is that funds already have systems in place to track these investor preferences. It expects them to modify those systems to encompass this. And because of the variability in what those systems are, the Commission did not, in the rule, specifically dictate how they did so. But, and again, we're taking an incremental approach to this, the Commission did, as you say, provide guidance from what it expects from funds. That's not a recognition that the systems are flawed. It's rather a prudential step to inform the industry. So if I'm an investor, and I'm trying to get paper, and for some reason I'm not getting it, I'm not getting it. If for some reason I can't, this 1-800 doesn't work, then what? I write a letter to the Commission? Certainly you could do that. Certainly you could contact your fund, your financial intermediary. But I can't get through to this. Well, Your Honor, because of the staff review, we'll know if that happens. But the Commission reasonably believed that these systems would, in fact, work, based upon comments that said they were sufficient, and frankly, based upon past experience. Again, these systems already exist. But what I'm trying to understand in my own mind is, who has the incentive here to make it easy for me to get paper? Well, Your Honor, the Commission has, as you say, in the release, let the industry know that it expects funds to implement these, and as convenient as possible. And as you say, there is this backstop of the staff review. The Commission is going to be actively monitoring how funds implement this, and will inform the Commission if additional steps are necessary. But again, the Commission is fully allowed, under this Court's case law, to take this kind of incremental approach, and wait and see where the problems are before regulating in a very detailed manner on those issues. Your Honor, I do want to touch briefly on, oh, I'm sorry, I see my time is up. Be very brief, Jill. Sure. I just wanted to note, of course, that the Court need not reach the merits on any of these issues, because the petitioners either lack a cause of action, or have failed to establish standing, or both. And so this case can be dismissed at the outset for those reasons. I don't want to take too much time running through those arguments. I'm happy to, if the Court doesn't... We have your arguments. Okay, certainly. And I do want to just one final note on the arbitrary and capricious point. The petitioners focus on a dichotomy between sort of the cost savings for funds and the interest of investors. And I want to make clear that in the context of mutual funds, that the cost savings are, in fact, in the interest of investors. These expenses are paid from the pool of fund assets, a share of which each investor owns. And so, of course, any change in those expenses directly affects the value of their investment. Does Ms. Luxton have any time? Thank you, Your Honors. So why do you think that consumer action met its burden to prove standing through the affidavit that they filed in connection with your opening brief? We would say, we submit, Your Honor, that that was self-evident standing, because the... The members of the organization are, and not only is there a failure to identify specific members and put in their affidavits, which Summers says you have to do, there's not even a description of who are the members, as opposed to the members, followers, or supporters, which is the formulation you use in that affidavit. Yes, Your Honor, it does say the members of nearly, who are part of a network of community-based organizations that serve seniors, minority Americans, disabled Americans. It says members, followers, or supporters. Yes, but members are among them. And one, two, five, 7,000? Your Honor, there's a very long line of cases that allows, when a standing issue is raised, to supplement in the reply brief, which we did with six. Only if you reasonably thought that that affidavit was good enough. And it doesn't seem to me like it's close. Well, Your Honor, it says our members include retirees and retirement savers who wish to receive reports from investment funds in paper form without incurring the burdens imposed by the affidavit. I think it was clear, Your Honor, that the members did feel that way, and it says the members have spoken to Mr. McEldowney and made those concerns clear to him, and he was filing the declaration with representational standing. In addition, there is, as I mentioned, a very long line of cases, which we cite at, I think, pages 18 and 19. And I think it's in page 18 to 9 of our reply brief, allowing supplementation of this, even after oral argument in American Library and other cases, to make clear that the standing is obvious. And here it is. There are six individual dues-paying members of Consumer Action, each of whom cites reasons why this rule will cause harm. One is a man suffering from a cerebral hemorrhage who can only operate using paper. His short-term memory is gone. Even a toll-free number, regardless of the maze that might be imposed in trying to get through to an investment company fund, is a huge burden on that person. And as the case law has made clear, the level of injury is not high. Even a trifle, a pebble, not a stone. I mean, to the extent a man with a brain injury presents unusual circumstances, that's not possibly something you can infer from the general affidavit filed by the director who says, oh, we have members and supporters who want paper. It says, many of these individuals, including members, have told us they prefer a choice to have paper communications because of what they're doing. They have limited access to the Internet, like those with a cerebral hemorrhage who can't use it, or a lack of digital literacy skills, and they depend on or prefer access to paper materials for information they need. There's a clear statement there. But, Your Honor, the key point in standing cases, and American Library makes this clear, is this is not a gotcha game. Well, American Library, first, as you know, there was a dissent. Secondly, in that particular case, the petitioner thought everybody understood why it had standing. And I remember preparing for oral argument and saying to my clerk, let's figure out where standing is shown. We got to oral argument, and at least two of the judges were unclear whether there was standing. So in that circumstance, in order to help the court understand whether there was standing, because everybody else had proceeded as though there was standing, and the agency had raised no objection before the court as to Article III standing. So supplementation was allowed. So the closest case you have in this court, it seems to me, is the case involving communities against the expansion of runways. Yes, Your Honor. But you still have to get past sort of questions that Judge Cassis is asking. And I guess if you're litigating in this circuit, why do you risk it? Well, Your Honor, the agency obviously recognized consumer action had standing. I mean, it specifically, at Joint Appendix 176, Note 51, cited consumer actions concerns. No, but I guess, I mean, you know this as well as I do. It's not an issue before the agency. It's only an issue when you get into court. And we have Sierra Club saying, tell us in your opening brief. And so you file an affidavit, or the organization files an affidavit, along the lines that Judge Cassis has described. And so the question is whether or not the record here is such that, unlike in American Library, where the courts couldn't figure it out, if you look at the record, where your opening brief, and there are organizations all over the rulemaking stating its positions, is it patently obvious that you have standing? Yes, it is patently obvious that we have standing, Your Honor. Well, I'm not, I won't put words in my colleague's mouth, but isn't the implication of the series of questions he's asking, what's left of standing? And the requirement that it be demonstrated when you come into court? Your Honor, that is why we thought it was self-evident that consumer action was all over the record, had made its points, which the Commission recognized that the impact of this rule would be harmful to its members, including seniors, disabled Americans, and so on, those in rural communities. So that is why it was... And that you did not have to name any particular individual who had any particular concern? Well, this is not a case, Your Honor, where the Commission was flailing around, not knowing whether someone had a standing issue. It was clear that the consumer action members were harmed by this rule. There's little dispute about that. And you saw their brief, all right? Yes. So they didn't promise not to raise standing, I gather. I gather they did not. But, Your Honor, I think this is a case where it is self-evident, just based on the facts and the record. And then, to make clear how obvious it is, the supplemental declarations lay out the specific harm to the individual members, which are manifest. So this is bleeding back into the merits, but it's also standing, but just on the harms, right? You're positing someone who is affluent enough to own mutual funds, right? And sophisticated enough to want to read the fine print in these documents, which, frankly, I've never done, right? Doesn't want to use the Internet, which is fine, but can't make a phone call? Well, Your Honor, it's not a simple phone call. Anyone who's ever dealt with toll-free number systems knows that they can be mazes, and the fact that the Commission felt it necessary to provide a list of suggestions... How would an investor who doesn't want to use the Internet or can't use the Internet just manage all of his or her mutual fund investments day by day? If not calling up Fidelity and saying, I want to buy 100 shares of Magellan or whatever? I don't know the arrangements by which they make their purchase and sell directions. Just like the relevance of people who use dating apps doesn't illustrate whether people who want to review shareholder reports want to do it in paper, want to have that full paper record in front of them, and want to preserve that right. Many of these people are not some affluent person with some monopoly-style investment portfolio. These are retirees. No, I understand, but they're willing and able to dive into these long, elaborate documents. Well, and Mr. Passa can only read paper. He can't use toll-free systems. He can't use the Internet at all. So there's at least one example among the declarations in this case of someone who is utterly reliant on paper. Many of the other declarants all require paper, want to keep it in their files. The fact that they are sophisticated enough to read an investment document of some length does not mean that they want to or should be burdened with making toll-free calls and reversing implied consent. Are there any investors who deal with their mutual funds by conveying instructions in a snail mail letter? I don't know, Your Honor. It seems pretty unlikely. Yes, they may have ways to do that, but they are not at all comparable tasks. Reading an investment portfolio, a shareholder report in hundreds of pages of documents is not the same thing as calling a mutual fund. It's not the same as calling an investment advisor or visiting him or her in person. These are two different things, and the fact remains, many, many people, including the declarants, want to receive these documents in paper form. And this rule flips the default and makes it much harder for them to do so, increasing the problem by using implied consent. Anyone who wants an electronic version of these reports can freely do so without the benefit of this rule. Thank you.
judges: Henderson, Rogers, Katsas